## R. E. LOVEJOY V. THE STATE.

No. 1788. Decided December 21, 1898.

**1. Forgery by Adding Names to a Promissory Note—Variance.**

On a trial for forgery in altering a promissory note by adding names as signers thereto, the production of the note with the names of the two original payors, whose names were not alleged to have been forged, was sufficient proof that the note was signed by them as alleged in the indictment; and when taken in connection with the testimony of one of them that they had signed the note, certainly showed that there was no variance as to allegation and proof in this respect.

**2. Same—Variance.**

Where the only possible difference between the instrument set out in the indictment for forgery, and the instrument offered in evidence, was that the one set out in the indictment contained on the right hand margin, "No.——; due ————;" Held, this was no part of the instrument and did not constitute a variance.

**3. Charge—Reasonable Doubt.**

On a trial for forgery in altering a note by the addition of two names as payors to it, where the court had already charged the jury that they must find the facts constituting the offense as charged beyond a reasonable doubt; that they could not find defendant guilty unless his guilt was established beyond a reasonable doubt, and that if they had a reasonable doubt of his guilt they would acquit him; Held, a further charge, that if they believed defendant did not sign the two names to the note they would acquit him; and they would also acquit if they believed the two parties signed their own names to the note, did not deprive defendant of the reasonable doubt, nor throw upon him the burden of proving his innocence.

**4. Forgery—Counts—Charge as to Penalty—General Verdict.**

Where an indictment for forgery contained two counts, one for forgery and the other for uttering the forged instrument, and the court submitted both counts in the charge, but in stating the punishment, stated it to be not less than two nor more than seven years, whereas the penalty for uttering is not less than two nor more than five years, and there was a general verdict for a penalty of two years, and the court applied the verdict to the count for forgery and rendered its judgment for forgery; Held, it can not be seen how the error in the charge as to the penalty for uttering could have affected defendant injuriously.

**5. Counts—General Verdict—Application—Practice.**

The court has authority to make the application of a general verdict to any count of the indictment, although such counts may embrace distinct offenses, if they are not repugnant to each other; and objection to such action, if erroneous, can not be raised for the first time on motions in arrest or for new trial.

APPEAL from the District Court of Bosque. Tried below before Hon. J. M. HALL.

Appeal from a conviction for forgery; penalty, two years imprisonment in the penitentiary.

On the 26th day of August, 1898, R. E. Lovejoy was indicted by the grand jury of Bosque County in two counts, one charging forgery, and the other count charging that he knowingly and fraudulently passed as true a forged instrument. The first count charges the forgery by the alteration of a genuine instrument then already in existence which had been made by J. W. Winters and F. B. Winters, and which before being altered was of the tenor following:

"$300.00                                    HICO, TEXAS, Nov. 2, 1896.
                    "No. ————.  Due ————.
"On or before Nov. 2, 1897, after date, without grace, for value received, I, we, or either of us, promise to pay to the order of R. E. Lovejoy, at Iredell, Texas, three hundred dollars, with interest at the rate of 10 per cent per annum from maturity until paid, and ten per cent additional on amount of principal and interest unpaid for attorney's fees, if placed in the hands of an attorney for collection, or if suit is brought on the same.
                                             "J. W. WINTERS,
                                             "F. B. WINTERS."

And which, after being altered by defendant, was of the tenor following:

"$300.00                                    HICO, TEXAS, Nov. 2, 1896.
                    "No. ————.  Due ————.
"On or before Nov. 2, 1897, after date, without grace, for value received, I, we, or either of us, promise to pay to the order of R. E. Lovejoy, at Iredell, Texas, three hundred dollars, with interest at the rate of 10 per cent per annum from maturity until paid, and ten per cent additional on amount of principal and interest unpaid for attorney's fees, if placed in the hands of an attorney for collection, or if suit is brought on same.
                                             "J. W. WINTERS,
                                             "F. B. WINTERS,
                                             "J. T. WADE,
                                             "T. R. JOHNSON."

The second count charges him with having knowingly and fraudulently passed as true to J. J. Durham a forged instrument in writing of the tenor following:

"$300.00          °                         HICO, TEXAS, Nov. 2, 1896.
                    "No. ————.  Due ————.
"On or before Nov. 2, 1897, after date, without grace, for value received, I, we, or either of us, promise to pay to the order of R. E. Love-

joy, at Iredell, Texas, three hundred dollars, with interest at the rate of 10 per cent per annum from maturity until paid, and ten per cent additional on amount of principal and interest unpaid for attorney's fees, if placed in the hands of an attorney for collection, or if suit is brought on the same.

> "J. W. WINTERS,
> "F. B. WINTERS,
> "J. T. WADE,
> "T. R. JOHNSON."

On September 10, 1898, he was tried upon both counts in the indictment, having pleaded not guilty to both counts. The court submitted both counts to the jury in its charge.

The charge submitted first the count for uttering, and concluded in this language: "Then [that is, after having found the requisites submitted by the charge to be true] you will find the defendant guilty as charged in the second count of the indictment, and assess his punishment at confinement in the penitentiary not less than two nor more than seven years."

The second paragraph of the charge submits the question of forgery to the jury, and concludes with this language: "Then [that is, after having found the requisites submitted by the charge to be true] you will find the defendant guilty of forgery as charged in the first count of said indictment, and assess his punishment at confinement in the penitentiary at any time not less than two nor more than seven years."

The jury rendered the following verdict: "We the jury find the defendant guilty, and assess his punishment at two years confinement in the penitentiary."

Upon this verdict the court proceeded to adjudge the defendant guilty of the offense of forgery, and upon the 23d day of September the court sentenced the defendant for the offense of forgery.

The State introduced the witness J. J. Durham, who testified that he bought the following note from the defendant, Lovejoy, which was read in evidence, and which is in haec verba as follows, to wit:

"$300.00                                    HICO, TEXAS, Nov. 2, 1896.

"On or before Nov. 2, 1897, after date, without grace, for value received, I, we, or either of us, promise to pay to the order of R. E. Lovejoy, at Iredell, Texas, three hundred dollars, with interest at the rate of 10 per cent per annum from maturity until paid, and ten per cent additional on amount of principal and interest unpaid for attorney's fees, if placed in the hands of an attorney for collection, or if suit is brought on the same.

> "J. W. WINTERS,
> "F. B. WINTERS,
> "J. T. WADE,
> "T. R. JOHNSON."

The witness J. J. Durham further testified that he bought the note from Lovejoy in November, 1896; that Wade and Johnson at that time lived at Iredell, in Bosque County, Texas, and the "Winters boys" in Erath County. The note became due and he notified the purported payors by mail, and hearing nothing from them he again notified them that the note was unpaid, and that he needed the money. A few days thereafter Mr. Johnson and J. T. Wade, as well as Dr. Kimmons, appeared at his office in Iredell, examined the note, and that was the first time this witness was informed by Wade and Johnson that they had not signed the note. Whereupon Dr. Kimmons produced a note that J. T. Wade admitted to have signed, and the witness being shown the signature of J. T. Wade on the Kimmons note and the signature of J. T. Wade on the note introduced in evidence, said that they resembled each other very much, if not exactly alike.

The State introduced the witness J. T. Wade, who testified that he knew Lovejoy, and knew that Lovejoy had seen his signature; that Lovejoy came to his house some time in November, 1896; he came into the cotton patch where Wade was picking cotton, Lovejoy being alone, and requested Wade to go his (Lovejoy's) security on a note, and Wade refused to do it unless secured, and the defendant said he had nothing with which to secure him. Wade refused to sign the note. Lovejoy showed him no note nor paper that day. Wade heard nothing from this note until some time in November, 1897, when he received notice through the mail from the witness J. J. Durham that he held the note and expected it to be paid when due. The witness did not mention the matter to Johnson until after he received a second notice from Durham, three or four days later, at which time he met Johnson in Hico, and after a conversation he decided to go to Iredell and did go to see Durham, and when the note was presented witness denied the signature, but admitted that he had signed the note that Kimmons had. Witness denied that he had squatted down in the field and handled any papers; nor did Lovejoy handle any papers of any kind when he went to see witness in the cotton field. Lovejoy claimed that he had come to collect some money; Lovejoy had been to witness' house and went into the cotton field where witness was picking cotton and got witness to sign up a note and application for some insurance, and had his (witness') signature, and when Lovejoy came to him to get him to go on his note, he was not at home, but on his son's place some distance from home; he did not sign said note nor authorize the defendant or anyone else to sign his name to said note.

The State introduced the witness T. R. Johnson, who testified that he was acquainted with the defendant, and did some insurance business with him in 1896 and gave him his note to cover the premium; witness remembered that Lovejoy came to his field where he was picking cotton some time in November, 1896; wanted him to sign a note with him to J. J. Durham for some money; witness refused to sign the note. Lovejoy did not show him the note. He did not recollect how much

money Lovejoy said he wanted to borrow; he did not show witness any papers that day in the field; witness saw no one with him that day; witness was about 300 yards from the house; it is an open country from the house to where witness was in the field. Anyone in the little pasture in front of witness' house could have seen them in the field; witness received a notice from Durham some time in November, 1897, to the effect that Durham held a note signed by witness, J. T. Wade, and the "two Winters boys," and indorsed by the defendant, Lovejoy, for $300, and he expected the same to be met when due. He paid no attention to the notice. Three or four days thereafter he received a second notice, and got with Wade and went with him to Iredell to see Durham in regard to the note; when Durham showed him the note he denied having signed it, and still denies it; said he did not sign his name to the complaint shown him; said he can read writing, but can not write; can write his name; did not authorize defendant or anyone else to sign his name to said note, nor did he sign his name to said note.

The State introduced the witness J. W. Winters, who testified that he lives near Lingerville, in Erath County, Texas, and is acquainted with the defendant, Lovejoy; Lovejoy came to see witness and his (witness') brother in November, 1896, and wanted them (witness and his brother) to go on his note to borrow some money from J. J. Durham; they declined to do so, saying unless he could get at least two other good men to sign the note they could not do so, and this Lovejoy promised to do. He promised to get H. B. Smith and W. M. Pierson to sign the note with them, and with this understanding they signed the note offered in evidence. Witness did not learn that the other parties had not signed the note until some time in November 1897, when he received a notice from J. J. Durham stating that their note would soon be due, and giving the names of the signers thereto. Witness immediately went in search of the defendant, Lovejoy, and found him in Hogtown, a little place in Erath County; witness went to see him because he did not want to pay the note himself; the defendant was at that time in the insurance business, and witness had done some business with him; they met in Hogtown; the defendant seemed excited, and told witness that he wanted to take up the Durham note just as soon as he collected some insurance money that was due him; witness then told the defendant that he, witness, had been informed that Johnson and Wade claimed not to have signed the note, to which the defendant replied, "I do not see how they can claim that." Witness told Lovejoy that if they had not signed the note he would go and fix it up at once and let it go no further, but that if they did sign the note he ought to be looking after them, and Lovejoy said, "I guess I should fix it up." Witness and his brother have given Durham a new note in place of this one. Witness admitted that he and his brother signed the note offered in evidence, but would not have signed it had it not been that Lovejoy agreed to get Smith and Pierson to sign with them. Witness never agreed that the names of

Johnson and Wade should be signed to the note. Witness' brother was not in attendance upon the court.

The State introduced H. B. Smith, who testified that he was acquainted with the defendant, Lovejoy, and had had some business transactions with him; that Lovejoy did not ask him to go security on his note.

The State introduced the witness W. M. Pierson, who testified that he was acquainted with the defendant, Lovejoy; that Lovejoy did not ask him in November, 1896, or at any other time, to sign a note with him for $300; witness had been informed by his wife that defendant came to their house about the 1st of November, 1896, and inquired for witness; witness was absent in the town of Hamilton.

The defendant introduced W. R. Boyd, then a drummer, an ex-sheriff of Hamilton County, who testified that he was acquainted with defendant, Lovejoy, and had known him for several years. Was also acquainted with T. R. Johnson and J. T. Wade; had done considerable business with Johnson, Lovejoy, and Wade while selling hardware and implements in Hico, Texas, for the last few years; was acquainted with the handwriting of Wade, Johnson, and Lovejoy, and that in his opinion J. T. Wade and T. R. Johnson signed the note which had been offered in evidence in the case, and that their names had not been signed to the note by defendant, Lovejoy.

The defendant introduced J. E. Cline, who testified that he had resided in Hico, Texas, for several years; was clerk in a store, and was acquainted with Lovejoy, J. T. Wade, and T. R. Johnson, and had had occasion to examine the handwriting of J. T. Wade and T. R. Johnson, and also the handwriting of the defendant, and that from his several years' experience as bookkeeper, and from what he knew of the writing of each of the parties, it was his opinion that J. T. Wade and T. R. Johnson signed the note introduced in evidence in the case, and from what he knew of the handwriting of Lovejoy, and from his experience as a bookkeeper, he was clearly of the opinion that Lovejoy did not write the names of J. T. Wade and T. R. Johnson to the note in controversy.

The defendant introduced the witness Bud Williams, who remembered taking the plaintiff out on the Duffau to see J. T. Wade and T. R. Johnson about the 1st of November, 1896; at that time witness was running a livery business at Hico, and they went out in a buggy; they first went to see J. T. Wade, who lived about one mile east of T. R. Johnson; witness stopped the team in the lane next to Wade's farm, and Lovejoy went down into the field where Wade and others were picking cotton; they were in plain view of the witness, and witness saw Wade and defendant Lovejoy handling some papers; he also saw Wade down on his knees, but could not say that Wade signed the note in controversy. When the defendant returned to the buggy he stated to witness that he had arranged his business all O K with Wade; he had got no money, but had got him to sign a note in lieu thereof. They went from there

to T. R. Johnson's and stopped the buggy in a little pasture immediately in front of T. R. Johnson's dwelling, and defendant got out and went into the cotton patch some two or three hundred yards to where Johnson and others were picking cotton; witness could see them plainly from where he was, and could see them handling some papers; he could not say whether the papers were white or blue, but he thought they were white; he saw Johnson in a hunkered position as though he was signing something, but he would not pretend to say he saw Johnson sign the Durham note.

In rebuttal the State introduced the witnesses William Connally, Ed Hickman, and J. D. Cole, all of whom testified as follows: "We and each of us reside in Hico, Texas, and are acquainted with the general reputation of J. T. Wade and T. R. Johnson in the community where they lived for truth and veracity, and it is good."

*Spencer & Kincaid,* for appellant.—The trial court erred in that part of his main charge wherein he says: "If you find the defendant passed said instrument as true, he should be punished by confinement in the penitentiary for a term of years not less than two nor more than seven years," when the law for passing a forged instrument is not less than two nor more than five years. See White's Ann. Texas Penal Code, art. 542; Buford v. State, 44 Texas, 525, and a long line of cases cited in Wilson's Crim. Stats., p. 328, sec. 15, under the proposition that "If the charge incorrectly instructs as to the penalty of the offense, it is fundamental error for which the conviction will be set aside, although the error be not excepted to, and although it be an error inuring to the benefit of the defendant."

The instrument introduced in evidence is materially variant from the one described in the indictment.

The instrument alleged was marked "No ———. Due ———." and after being altered omitted "the" before the word "same" in the last line of the instrument, whereas the one introduced in evidence contained no such marks, and is therefore a different instrument from the one described in the indictment. The instrument introduced had also undergone another change after "the" had been erased; it had again been inserted, and it reads "the same" instead of "same," as alleged. Bennett v. State, 36 S. W. Rep., 947; McDonnell v. State, 24 S. W. Rep., 105; Thomas v. State, 18 Texas Crim. App., 222; Ex Parte Rogers, 10 Texas Crim. App., 661.

The court having submitted both counts in the indictment to the jury, and the second count charging a separate and distinct offense under the law, and the court having in his charge required the jury to say in their verdict of what offense they convicted the defendant, the verdict as rendered is too general and uncertain to support the judgment. State v. Pierce, 37 S. W. Rep., 815; Rowe v. State, 44 S. W. Rep., 266; Karlonski v. State, 44 S. W. Rep., 244; Hudson v. State, 38 S. W. Rep., 1107; Hays v. State, 28 S. W. Rep., 203; Shell v. State, 38 S. W. Rep.,

207; Guest v. State, 24 Texas Crim. App., 530; Miller v. State, 16 Texas Crim. App., 417; Slaughter v. State, 24 Texas, 410; Alston v. State, 41 Texas, 39; Senterfit v. State, 41 Texas, 186; Buster v. State, 42 Texas, 315.

The court in charging the jury submits generally the reasonable doubt, but we submit that this does not cure the former errors in the charge, because the charge had been so worded that it was impossible for the jury to understand that if they had a reasonable doubt of the fact that the defendant had signed the names of J. T. Wade and T. R. Johnson to the instrument, or that the witnesses T. R. Johnson and J. T. Wade had not signed their own names to the instrument, they would acquit the defendant. They must have believed under the charge, from the evidence, either that the defendant did not sign the names of Wade and Johnson to the instrument, or that Wade and Johnson did not sign their own names to the instrument before they could acquit the defendant.

We seriously present for the consideration of the court the question of the sufficiency of the verdict, with a full understanding of the fact that this court has in Rosson's Case, 38 Southwestern Reporter, 788, heretofore passed on a similar question, but we are fully convinced that if that decision has any application to this case then the court was in error in rendering it, and we respectfully ask it to reconsider the opinion in the light of the authorities cited in the cases from the State of Missouri, supra, which appear to us to be perfectly conclusive upon the question. Furthermore, the logic is in favor of our contention. If both counts in the indictment charged the same offense, then it could be justly said that the court had sentenced the defendant for the offense of which he had been convicted by the jury; but when the indictment contains two counts, and each count charges a separate and distinct offense, and the verdict of the jury is general without specifying which offense, how can it be said that the judgment responds to the verdict? The offense of forgery is a more heinous one, made so by the law, than the offense of passing a forged instrument, but in this case it is altogether as probable that the jury convicted the defendant of passing a forged instrument as that they convicted him of forgery, and yet the court has vi et armis sentenced the defendant for forgery and convicted him of a more heinous offense than that of which the jury may have convicted him. It is impossible that the law can tolerate such a proceeding. The court can not usurp the province of the jury in branding the defendant with a more heinous charge than that of which he has been convicted by the jury. Suppose for a moment that the defendant had been charged in the same indictment with the offense of perjury and false swearing, and the jury had simply found a general verdict, would it not be shocking to say that the court could sentence the defendant to the penitentiary for perjury, the more heinous offense of the two?

*Mann Trice,* Assistant Attorney-General, for the State.—The indictment contained two counts,—one for forgery, the other for passing as true a forged instrument. The court charged on both counts, and the jury returned a general verdict, finding defendant guilty and assessing his punishment at two years in the penitentiary. Appellant complains because the court charged the jury as to punishment for passing a forged instrument from two to seven years, when the statute provides two to five years. Penal Code, art. 542. Inasmuch as a general verdict was returned, the conviction can be applied to the count of the indictment for forgery. But conceding this can not be done, appellant was not injured in any manner by the charge, for the jury assessed the lowest punishment—two years—against defendant, and this was as much as he could ask under the evidence.

The evidence amply supports the judgment, and the same should be affirmed.

HENDERSON, Judge.—Appellant was convicted of forgery, and his punishment assessed at confinement in the penitentiary for a term of two years; hence this appeal.

The forgery declared is alleged to consist in fraudulently and without lawful authority altering a certain promissory note, in the sum of $300, signed by J. W. Winters and F. B. Winters, by adding thereto the names of J. T. Wade and T. R. Johnson. Appellant contends that the State failed to prove that said note was originally signed, as alleged, by J. W. Winters and F. B. Winters. We have examined the record carefully in this regard, and in our opinion the testimony is sufficient to show that it was so signed, and there is no variance between the allegations and the proof in this respect. True, Durham, the payee of the note, alluded to the original signers thereof as the "Winters boys." The note itself was introduced, and showed to be signed, as alleged, by J. W. Winters and F. B. Winters. It seems to us that, as alleged, this was sufficient proof, especially when same was referred to by the witness Durham as having been signed by the Winters boys. But, in addition to this, J. W. Winters, one of the signers of said note, testified that defendant came to see him and his brother, and wanted them to go on his note, in order to borrow some money from J. J. Durham; that he and his brother signed said note with the understanding that he was to get two other parties to sign the same. He further stated that he and his brother had executed to Durham a new note in place of the note now before the court, and that he and his brother would not have signed the old note, had it not been that appellant had agreed to get two other persons to sign the note. As stated above, we think the production of the original note, signed as alleged by J. W. Winters and F. B. Winters, the indictment not being predicated on the forgery of their names, was sufficient proof of such note so signed; but the additional testimony of J. W. Winters certainly places this question beyond any cavil.

Appellant claims there is a variance between the instrument set out in the indictment and that offered in evidence. No question appears to have been made as to this matter in the court below. The only possible difference in the two instruments, as contained in the record, is that the one set out in the indictment contains "No ———. Due ———," on the right hand margin. This is no part of the instrument, and does not constitute a variance.

He also contends that the article "the" occurs in the copy set out in the record before the word "same," in the last line of the note, whereas the article "the" does not occur in the same place in the note as set out in the indictment. We regard this as hypercritical.

Appellant, in his brief, complains of the following charge of the court: "If you believe from the evidence that the defendant did not sign the names of J. T. Wade and T. R. Johnson to the instrument described in the indictment, then you will acquit the defendant. You are further instructed that, if you believe from the evidence that J. T. Wade and T. R. Johnson signed their names to said instrument, then you will acquit the defendant." He complains of this charge for the first time in this court, and urges that, notwithstanding no exception was taken to this charge in the lower court, it is fundamental error, and the case should be reversed. If we concede that appellant could bring this matter forward now for the first time, yet we fail to see any error committed by the court in the above-mentioned charge. The contention is that the court deprived appellant of the reasonable doubt, and threw upon him the burden of proving his innocence. The court had already charged the jury that they must find the facts constituting the offense,—among other things, that appellant, without lawful authority, signed the names of J. T. Wade and T. R. Johnson to said note,— and that they must find this beyond a reasonable doubt before they could convict the defendant. And in addition to this the jury were instructed that they could not find the defendant guilty, unless the evidence established his guilt beyond a reasonable doubt, and if they had a reasonable doubt of the guilt of defendant, they would acquit him. We fail to see how the charge complained of deprived appellant of the reasonable doubt as to said defensive matters, when they were expressly told in the charge that they must find beyond a reasonable doubt that said names were signed by appellant to said note without lawful authority. There is nothing in this contention.

Appellant insists that the court having committed an error, in stating the punishment for uttering said forged instrument erroneously, the case on that account should be reversed. The court submitted both counts in the indictment, and gave the punishment for both forgery and uttering a forged instrument at imprisonment in the penitentiary not less than two nor more than seven years. This is a correct statement of the punishment for forgery, but the statute fixes the punishment for uttering a forged instrument at confinement in the penitentiary not less than two nor more than five years. It will be seen from an

inspection of the record that the jury returned a general verdict of guilty, and that the court, in rendering the judgment and entering the sentence against appellant, applied the verdict to the count for forgery. A number of cases in this State have been reversed because the court, in stating the punishment prescribed, charged a punishment different from that contained in the statute punishing the offense. This has been so held even where the maximum punishment stated by the court was less than that prescribed by the statute. We would observe here, however, that we can see no reason or common sense for the reversal of a case where the court has given the correct minimum punishment prescribed by statute, and has given a less maximum punishment than fixed by law. Certainly in such a case the charge will inure to the benefit of defendant. In this case, however, the court gave a greater maximum punishment than that prescribed for uttering a forged instrument. The jury, however, did not find a greater punishment, but found the minimum prescribed for that offense, and also for the offense of forgery. The objection to this charge was raised for the first time in the motion for new trial. Our recent statute on the subject provides that the charge must be excepted to, and must appear to have operated to the prejudice of appellant. We fail to see how the charge in question affected appellant injuriously. This same question, however, involves another question raised by appellant; that is, the power of the court to apply the finding of the jury to the count for forgery. If the court had authority to make this application, and the charge of forgery was correct as to punishment, then an incorrect charge on the count for uttering would be immaterial. Appellant raised this objection by a motion in arrest of judgment, and he thus questions the action of the court in applying a general verdict of guilty under both counts in the indictment to the count of forgery. It will be conceded that forgery and uttering a forged instrument are two distinct offenses, and the punishment different, as to the maximum prescribed. If we follow the rule heretofore laid down by this court on the subject, we must uphold the action of the court. See Southern v. State, 34 Texas Crim. Rep., 144; Carr v. State, 36 Texas Crim. Rep., 3; Rosson v. State, 37 Texas Crim. Rep., 87. We understand, however, that appellant attacks the correctness of these decisions. Mr. Bishop says (1 Bishop Criminal Procedure, section 1015, subdivision 4): "Where distinct offenses are charged in separate counts, a general verdict of guilty is not ill in form, and it operates as a conviction of all. Yet it has been deemed, and in reason it is just, that a defendant may, on request, have separate findings on the several counts, or in some way have the jury pass on each by itself. There may be an acquittal on some counts, and a conviction or disagreement on others, and the count whereon was the disagreement will be subsequently submitted to another jury." Id., section 1015, subdivision 5: "No form of verdict will be good which creates a repugnance or absurdity in the conviction. For example, since one can not both steal a thing and commit the offense of receiving it from the thief, if an indictment charges

him, as it may, with the former in one count and the latter in another, a general verdict of guilty, being inconsistent, will not sustain the judgment." Id., section 1016, subdivision 2: "Because a defendant waives his right by not objecting when an imperfect verdict is rendered, if it is set aside he shall not be discharged, but tried anew. The court can not, instead thereof, change the verdict or judgment to what it should be." Numerous authorities are cited in note. Archbold's Criminal Pleading lays down the same general doctrine. 1 Archb. Crim. Pl., p. 295, and notes. We have examined a number of authorities referred to, treating on this question, where distinct offenses are charged in the same indictment in different counts, and a jury returned a general verdict of guilty, without designating upon which count they find against the defendant, as to the power of the court to apply the verdict to any particular count. The following authorities seem to authorize the court to do this: State v. Tuller, 34 Conn., 280; Scott v. State, 31 Miss., 473; Lovell v. State, 45 Ind., 550; United States v. Furlong, 5 Wheat., 184. On the other hand we cite the following cases as holding a contrary view: Boyd v. State, 7 Cold., 69; State v. McCauless, 31 N. C., 375; State v. Johnson, 75 N. C., 123; State v. Scott, 15 S. C., 434. Other cases referred to are not accessible to us. As stated before, if we adhere to the rule laid down by our court in cases in which this question has been presented, we must hold that the court has the power and authority to make the application of a general verdict to any count of the indictment, although such counts may embrace distinct offenses. Of course, it would be the better practice,—where an indictment contains counts charging distinct offenses, with different punishments,—after the evidence is all in, to require an election. If there is no request for this, and it is not done, then the court, in submitting the various counts, should require the jury to make a finding upon each particular count, or certainly to state upon which count they find appellant guilty. But that is not the question here. The question now presented is, where this practice is not pursued, and the jury have returned a general verdict under an indictment with different counts covering distinct offenses, and the court has applied the verdict, can we uphold the action of the court in this regard, when it is presented for the first time by a motion in arrest of judgment or for new trial? These authorities which hold that the court has the authority base their decisions upon the proposition that the verdict is general; that is, the jury have found defendant guilty upon all the counts, and it is perfectly competent for the court to apply it to any one. There is much force in this view. But it is contended that this involves the ascertaining by the court and the selection of the particular offense charged in some one of the counts in the indictment; and so the court is made to usurp the functions of the jury, and determine the particular offense of which they may have found him guilty. But, when we remember that the jury have found him guilty upon every count of the indictment, it would certainly seem competent for the court to apply their finding to some particular count of the in-

dictment; and, when the punishment assessed by them is a punishment authorized to be applied to the offense ascertained by the court, we can see no difficulty in this doctrine of selection and application; nor is it in any respect the usurpation of the functions of the jury. Of course, he must select a count sustained by the evidence; otherwise his action would not be supported, but will be subject to revision in motion for new trial, or, if this is refused, by the revisory court. We are not here treating of repugnant offenses. It may be the correct doctrine, if counts in an indictment contain distinct offenses which are repugnant one to the other, that in such case the court can not say on which one the jury may have found defendant guilty. But there is no repugnancy in this case between the act of forging and uttering the forged instrument. Indeed, they are entirely consistent with each other, and as a general rule the forger is also the utterer. No error appearing in the record, the judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for rehearing was overruled at the Dallas term, 1899, without a written opinion.—Reporter.]